UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| DOMINION EXPLORATION & PRODUCTION, INC.  AND PIONEER NATURAL RESOURCES U.S.A., INC. | * | CIVIL ACTION |
| | * | NO.  07-3888 |
| VERSUS | * | SECTION "C" |
| AMERON INTERNATIONAL CORPORATION | * | |

### ORDER AND REASONS[1]

Before the Court is a Motion to Remand filed by the Plaintiffs, Dominion Exploration & Production, Inc. ("Dominion") and Pioneer Natural Resources U.S.A., Inc. ("Pioneer").  (Rec. Doc. 7).  In the motion, the Plaintiffs seek remand, asserting that federal question jurisdiction does not exist and that the motion for removal is untimely.  Defendants, Ameron International Corporation ("Ameron") and its insureds, oppose the motion.  The motion is before the Court on the briefs, without oral argument.  Having considered the memoranda of counsel, the record, and the applicable law, the Court finds that Plaintiffs' motion should be **GRANTED**.

### I.      STATEMENT OF FACTS

According to the petition and amended petition, in June 2001, the Plaintiffs contracted with SparTEC, Inc. ("SparTEC"), a subsidiary of J. Ray McDermott, Inc. ("McDermott"), for the design, engineering, construction, delivery, and installation of an offshore spar floating production facility ("spar").  McDermott in turn contracted with Ameron International Corporation ("Ameron") for a three coat paint system for the spar's topside facilities, its hull,

---

[1] Julie Y. Oh, a third year student at Tulane Law School, assisted in research and preparation of this decision.

and the production system. The contract required that the paint system be free of all lead and lead based chromates. Ameron, in its Material Safety Data Sheets, indicated compliance with the requirement and otherwise assured the plaintiffs that the paint did not contain lead chromates. Plaintiffs had worked directly with Ameron with the same paint system on other Dominion facilities. In March or April of 2002, employees working on the spar noted different shades in the colors of the paints applied to the spar's deck and hull. Independent testing established the presence of lead chromates in the paint, which was confirmed by Ameron in November of 2002. SparTEC and McDermott removed and replaced the paints with a lead free paint system, allegedly resulting in delays in the spar's completion. The facility was constructed on land prior to being placed on the Outer Contintental Shelf. ("OCS").

In May 2003, Plaintiffs filed a state action against Ameron claiming negligent and/or intentional misrepresentations and warranties seeking all costs, expenses, and consequential damages, including increased costs and delayed and deferred production damages sustained as a consequence of Ameron's alleged fault. In August 2007, Plaintiffs amended the petition to include the following claims: 1) breach of contract; 2) negligence; 3) breach of warranty; 4) redhibition; and 5) violation of the Louisiana Products Liability Act. Plaintiffs also brought suit against Ameron's insurers under the Louisiana Direct Action Statute, La.R.S. 22:655.[2] Ameron and its insurers removed this matter based on federal subject matter jurisdiction under the Outer Continental Shelf Legislative Act ("OCSLA"), 43 U.S.C. §1331, et seq.

## II.  STANDARD OF REVIEW

A civil action filed in state court may generally be removed to federal court if the federal court has original jurisdiction. 28 U.S.C. § 1441(a). Removal statutes should be strictly construed in favor of remand. *York v. Horizon Fed. Sav. And Loan Ass'n*, 712 F.Supp. 85, 87 (E.D. La. 1989) and *Shamrock Oil & Gas Corp. v. Sheets*, 61 S.Ct. 868 (1941). The removing

---

[2] These insurance companies include: (1) Ace American Insurance Company, (2) Greenwich Insurance Company, (3) American Home Assurance Company, (4) AIU Insurance Company, and (5) National Union Fire Insurance Company.

party carries the burden of showing that federal jurisdiction exists and that removal is proper. *Willy v. Coastal Corp*., 855 F.2d 1160, 1164 (5th Cir. 1988). Doubts or ambiguities regarding removal are to be construed against removal and in favor of remand. *Manguno v. Prudential Property and Cas. Ins. Co.,* 176 F.3d 720, 723 (5th Cir. 2002).

## III.    ANALYSIS

The OCSLA vests jurisdiction to federal district courts "for cases and controversies arising out of, or in connection with (A) any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals, of the subsoil and seabed of the outer Continental Shelf, or which involves rights to such materials." 43 U.S.C. § 1349(b). The issue in this case is whether the paint agreement and its subsequent breach arises out of an "operation" involving the "exploration, development, or production" of materials of the outer Continental Shelf. The Fifth Circuit's statutory interpretation of the OCSLA is imperative to the analysis of the facts of this case, in particular the terms "operation," "development," and "production."**[3]**

Congress enacted the OCSLA out of its concern to establish federal control over resources found on the Outer Continental Shelf. *Laredo Offshore Constructors, Inc. v. Hunt Oil Company*, 754 F.2d 1223 at 1227 (5th Cir. 1985). The Act gave the federal government a proprietary interest in the OCS and established a regulatory scheme governing the leasing and operations there. *Id.* The Act's definitions reflect Congress's concern in efficiently regulating the resources in the area. *Huffco Petroleum Corp v. Transcontinental Gas Pipe Line Corp.*, 681 F.Supp. 400, 401 (S.D. Tex. 1988). The definition of "development" reflects Congress's intent to involve itself, as well as the federal courts, in the process of removing minerals of quantity

---

[3] The OCSLA term "exploration" is excluded from the analysis, because it is irrelevant to the analysis of the facts at hand. "Exploration" is defined as the "process for searching for minerals, including (1) geographical surveys where magnetic, gravity, seismic, or other systems are used to detect or imply the presence of such minerals, and (2) any drilling, whether on or off known geological structures, including the drilling of a well in which a discovery of oil or natural gas in paying quantities is made… to determine whether to proceeds with development and production…". 43 U.S.C. § 1331(k). The spar was not intended to be used for exploration activities, but for the development and transport of minerals. Its function lacked the activities listed under "exploration."

from the seabed after discovery.[4] *Huffco* at 401.  Congress defined "production" as the activities that take place after the successful completion for the removal of the minerals, including transferring the minerals to shore.[5] *Id.*  However, Congress failed to define the term "operation."

The Fifth Circuit defined "operation" as the doing of "some physical act conducted on the outer Continental Shelf which involves exploration, development or production of the minerals…" *Amoco Production Co. v. Sea Robin Pipeline Co.,* 844 F.2d 1202, 1207 (5th Cir. 1988) (citing 43 U.S.C. § 1349).  "Operation" does not stand alone, and cannot be cut off from inquiry into exploration, development, and production. *Id*.  In order to determine whether an operation is being conducted on the OCS, thereby confirming federal jurisdiction under the OCSLA, the operation must involve exploration, development, or production of minerals on the OCS.  *Tennessee Gas Pipeline v. Houston Casualty Insurance Co*., 87 F.3d 150, 154-5 (5th Cir. 1996).  In *Tennessee Gas Pipeline*, the Fifth Circuit held that a platform affixed to the OCS and used to extract and transport minerals from the OCS was "clearly enough physical activity on the OCS to constitute an operation."  *Id*. at 154.  The Fifth Circuit also cited *EP Operating Ltd. Partnership v. Placid Oil Co.,* 26 F. 3d 563 (5th Cir. 1994), where the court held that a platform that had ceased activity was still considered to be an "operation" under the OCSLA.  The court noted that "the construction of the platform and pipes to transport minerals was sufficient physical activity to constitute an operation under § 1349."  *Id*.

The term "operation" in both *Tennessee Gas Pipeline* and *EP Operating* is used to describe the actual physical presence of platforms on the outer Continental Shelf that were used currently or in the past to search for, discover, produce, and transfer minerals out of the outer Continental Shelf.  Defendants read *Tennessee Gas Pipeline* more broadly in their allegation that lost use of an offshore pipeline triggers federal jurisdiction under the OCSLA.  The case turned

---

[4] "The term 'development' means those activities which take place following discovery of minerals in paying quantities, including geophysical activity, drilling, platform construction, and operation of all onshore support facilities, and which are for the purpose of ultimately producing the minerals discovered."  43 U.S.C. § 1331(l).
[5] "The term 'production' means those activities which take place after the successful completion of any means for the removal of minerals, including such removal, field operations, transfer of minerals to shore, operation monitoring, maintenance, and work-over drilling."  43 U.S.C. § 1331(m).

on whether the accident between the tug boat and platform "arose out of or in connection with" Tennessee Gas's operation on the OCS, and the court concluded it did. *Id.* at 155. Damages for lost use of production fell under the OCSLA jurisdiction in *Tennessee Gas Pipeline*, because an OCLSA operation existed prior to the accident causing the lost production. *Id*. at 154. This is not the case with the spar in the instant dispute. The spar was on land at all times relevant to the contract performance and breach. Simply because the spar would eventually be placed on the OCS does not give it the required operation to fall under the OCLSA jurisdiction.

Defendants also read *EP Operating* broadly, analogizing the dormant platform in *EP Operating* to the not-yet-completed spar in the case at hand. This Court disagrees with this reading. The platform in *EP Operating* had been active until the mineral well no longer produced "paying quantities." *EP Operating,* 26 F. 3d at 565. The court held that an OCSLA "operation" existed despite the platform's dormancy, because the production ability of the facility remained. The platform and fifty-two miles of pipeline constituted "substantial acts undertaken on the OCS," and their future use for the transport of minerals was "very likely." *EP Operating,* 26 F. 3d at 567. This must be distinguished from the instant case, where the spar was still on land when the paint agreement was breached. The spar had not been used for any activity related to exploration, development or production, and had not yet even been placed on the OCS. Without any activities linking the spar to exploration, development or production on the OCS, a finding that an "operation" according to the language of the OCSLA cannot be made.

This dispute also raises the question as to whether the contract itself falls under the OCSLA jurisdiction. This Court adheres to the Fifth Circuit's interpretation of the relationship between contract disputes and questions of the OCSLA jurisdiction. If the contract-in-dispute lacks a sufficient nexus to the exploration, development, and production of minerals, then the OCSLA jurisdiction does not apply. In *Laredo Offshore Constructors, Inc. v. Hunt Oil Company*, 754 F.2d 1223 (5th Cir. 1985), the Fifth Circuit held that the OCSLA applied to a contract breach that dealt specifically with the construction of a fixed platform on the OCS. The

court's reasoning was based on the Act's statutory language, which expressly specified the platform construction as an activity that falls under the term "development." *Id.* at 1229. The instant case differs significantly from the facts of *Laredo*. In *Laredo*, plaintiff was contracted to build a fixed platform on the OCS. It installed four piles upside down into the OCS, and incurred more damages in its attempts to rectify the situation. Plaintiff then brought suit for nonpayment. *Id*. at 1225. In the instant case, a provision in a paint agreement is at the center of the dispute. The spar was on land when it was painted and the contract allegedly breached. Unlike the facts in *Laredo*, the paint agreement and its subsequent breach are not sufficiently linked to the statutory definition of "development" in the OCSLA.

Additionally, Plaintiffs cite *Gulf Island, LLC v. J. Ray McDermott, Inc.,* 2005 WL 180947 (E.D. La. 2005), where Judge Feldman held that the OCSLA did not apply to a contract breach for the nonpayment of topsides that were constructed for a floating oil and gas production facility. The fact that the topsides were to be used on the OCS was deemed "irrelevant" to the contract dispute and the cause of action. *Id*. at *3. *Gulf Island* weighs in favor of Plaintiffs, who assert that the contract in breach (relative to the paint job) has no relationship with an operation or the development and production of minerals.

Defendants cite *BP Exploration & Production, Inc. v. Callidus Technologies, LLC,* 2003 WL 193450 (E.D. La. 2003), where Judge Zainey held that the OCSLA could apply to situations where defective equipment was installed on a fixed platform, because the lack of equipment could affect the overall production of the platform. This Court is not persuaded that its rationale applies to an allegedly defective land-based paint job.

The Court finds that these cases do not authorize OCSLA application to the instant dispute. *Laredo* applied the OCSLA to a construction contract for a fixed platform on the OCS, which is a statutorily defined activity that falls under a specific OCSLA definition. *Gulf Island* held that the OCSLA did not apply to construction contracts for the building of separate components offsite that would eventually be used on a floating production facility. *BP Exploration* suggested that the OSCLA could be applied to construction contracts for equipment

6

installed on fixed platforms, if the defective equipment could potentially affect the production of the platform. The dispute at hand arises from a paint agreement, and not a contract for the construction of a fixed platform.  Additionally, the paint agreement does not affect an operation on the OCS or the development and production of natural resources.   Following this line of contract cases, the Court finds that the OCSLA does not apply to the paint agreement and the plaintiffs' claims.

Next, Defendants argue that because Plaintiffs seek damages resulting from delayed or deferred production, the dispute falls under the OCSLA.  Analysis of this argument turns on the Fifth Circuit's determination of the statutory definition of the term "production."  Contracts found to be sufficiently linked to "cessation, suspension or reduction of production" of minerals are to fall under the OCSLA jurisdiction.  *Amoco Production Co. v. Sea Robin Pipeline Co.,* 844 F.2d 1202 (5th Cir. 1988).

In *Sea Robin*, the Fifth Circuit held that "take-or-pay" obligations in contracts for the sale/purchase of natural gas were sufficiently linked to the production of minerals, and therefore OCSLA applied.  The court noted that exploration and development are preparatory stages of production, and "the subsequent *cessation*, *suspension or reduction* of production gives rise to controversy." *Id*. at 1207.  Taking judicial notice of certain considerations unique to oil and gas wells, the court found that changes in the rate of oil or gas flow cause both changes in actual production and may affect the potential production to be recovered from the well. *Id*. at 1209-10.  The court noted that Congress intended for the Act to cover disputes arising from the alteration of "progress or production of activities on the OCS threatens to impair the total recovery of the federally-owned minerals from the reservoir… underlying the OCS." *Id*. at 1210.  The nature of the contract dispute in the instant case differs significantly from *Sea Robin*.  The paint agreement can neither be characterized under the OCSLA definition of "production," nor is the paint agreement specifically linked to the cessation, suspension or reduction of production of minerals. The spar had not yet been moved to the OCS and production had not begun.

Plaintiffs cite *NCX Company, LLC v. Samedan Oil Corporation*, where Judge Porteous

7

denied the OCSLA application in a contractual dispute related to the calculation of fees. 2004 WL 203079 (E.D. La. 2004).   In *NCX*, the parties entered into a platform and facilities Throughput Agreement, and subsequently disputed a provision and calculation of processing fees.  The court held that the dispute "does not affect the flow of production or development, nor does it affect the efficient exploitation of natural resources in the OCS.  It is simply a breach of contract claim which does not implicate the interest expressed by Congress in the efficient exploitation of natural resources of the OCS." *Id.* at *3.  The court specified that the *NCX* litigation involved "contractual provisions regarding the payment/price of services which have been already rendered, not provisions governing production or development." *Id*.   The paint agreement similarly does not affect the production or exploitation of natural resources in the OCS.  Defendants argue that because Plaintiffs seek damages due to losses from deferred or delayed production, a sufficient nexus to production exists for OCSLA to apply to the paint contract.  Defendants fail to understand the court's reading of contracts-in-disputes for specific provisions that affect the operation, development or production of minerals.  Damages for delayed or lost profits may result from contract disputes, but such damages cannot be the sole basis for OCSLA to apply.

Plaintiffs also cite *LLOG Exploration Company, LLC v. Certain Underwriters at Lloyd's of London,* 2007 WL 854307 (E.D. La. 2007) (J. Livaudais), which directly addressed damages due to deferred or delayed production.  *LLOG* presented an insurance dispute resulting from property damage losses and business interruption losses at several production facilities in the Gulf of Mexico.  LLOG carried "all risks" insurance policy covering the damaged production facilities.  Alleging that the insurers refused or would refuse to indemnify the insurance policy, LLOG filed suit in state court seeking declaratory relief and breach of contract.  Addressing the Insurers' removal motion, LLOG argued that the insurance coverage dispute lacked the sufficient nexus with exploration, development or production as required in OCSLA.  The insurers argued that because LLOG claimed coverage for loss of production during the recovery period, the insurance dispute involved the production of minerals within the meaning of the

8

statute's jurisdictional scope. *Id*. at *2.  Analyzing the term "production," the court concluded that OCSLA did not apply, reasoning that the interruption and loss of production on the insured property was not due to the application of any provisions from the insurance contract.  The court also noted that the "Insureds had not identified for the court any terms or conditions in the insurance contract at issue that directly affect the rate or manner of production of oil and/or gas on the covered facilities." *Id*. at *4.  The analysis provided in *LLOG* is pertinent to the analysis of the facts at hand.  In the instant case, the paint agreement does not provide any terms or conditions that directly affect the rate or manner of production of minerals from the OCS.  The paint agreement provided only for warranties that the paint applied to the spar would be lead and lead chromate free.  The breached paint agreement does not alter the flow of production or otherwise affect the efficient exploitation of natural resources on the OCS; it delayed the date operation and production may begin, but it did not stop, interrupt, or suspend an operation already in progress on the OCS.  Therefore, the OCSLA does not apply.

## B.

Although the remand is based on lack of subject matter jurisdiction, the Defendants face procedural  problems with removing the case four years after the initial pleading.  Plaintiffs filed an amended petition that included an addition of five defendants (the Insurers) and five claims related to the alleged breach of the paint agreement.  Defendants assert that their request for removal within the statutory thirty days after the amended pleading is timely, because their motions for removal were submitted promptly after the amended petition was filed.  Defendants read the thirty-day deadline set forth in 28 U.S.C. § 1446(b) broadly, arguing that a new window exists once an amended petition that includes new defendants is filed.

The rule in 28 U.S.C. § 1446(b) states:

> The notice of removal of a civil action or proceeding shall be filed within thirty days after the receipt by the defendant, through service or otherwise, of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based, or within thirty days after the service of summons upon the defendant if such initial pleading has then been filed in court and is not required to be served on the defendant, whichever period is shorter.
> If the case stated by the initial pleading is not removable, a notice of removal may be filed within thirty days after receipt by the defendant, through service or otherwise, of a

>copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable, except that a case may not be removed on the basis of jurisdiction conferred by the section 1332 of this title more than 1 year after commencement of the action.

The Fifth Circuit maintains a strict reading of § 1446(b) and adheres to the "general rule" of timeliness of removal. The rule indicates that if the first served defendant abstains from seeking removal or does not effect timely removal, subsequent defendants cannot remove. The Fifth Circuit stated in response to criticism of the unfairness of the general rule:

>… [W]e do not perceive the suggested unfairness to the subsequently added defendant who is merely not granted an opportunity that might have been available to others. A defendant who is added to a case in which a co-defendant has failed to seek removal is in no worse position that it would have been in if the co-defendant had opposed removal or were domiciled in the same state as the plaintiff. To permit the defendants in this case to obtain removal after they have tested state-court waters for four years would give them a second opportunity to forum-shop and further delay the progress of the suit. The unfairness of this to the plaintiff outweighs the unfairness, if any, to the last-joined defendant. The forum for a suit ought to be settled at some time early in the litigation.

*Brown v. Demco, Inc.*, 792 F.2d 478 at 481 (5th Cir. 1986).

Here, Ameron, the original Defendant, could have sought removal at the commencement of litigation, which it chose not to do. Defendants now cite *Braud v. Transport Service Company of Illinois,* 445 F.3d 801 (5th Cir. 2006) as authority for timeliness of removal. In *Braud*, a class action complaint was amended to add a new defendant, and defendants sought to remove the case to federal court under the Class Action Fairness Act (CAFA). The court granted removal, holding that an amended complaint to add a new defendant commences a new suit under CAFA. The court reasoned that the statutory language of CAFA "plainly" indicated that any defendant could remove without the consent of other defendants involved in the class action. *Id*. at 808. The facts of *Braud* are so distinguished from the facts in the instant case that it does not apply. Defendants suggest that the court's holding in *Braud* reveals a change of the Fifth Circuit's adherence to the general rule on timeliness. (Rec. Doc. 7, p. 4). However, Defendants do not provide any case law that addresses a timeliness issue outside of CAFA where the court permitted removal against the general rule, and the Court's research uncovers none. Under the circumstances and arguments presented, and in deference to the Fifth Circuit's adherence to the

general rule on timeliness, this Court would decline to expand the rule set forth in *Braud*.

## IV.    CONCLUSION

Based on the record and the law, the Court finds that the Defendants have not established subject matter jurisdiction.  In addition, the Court is mindful that removal jurisdiction is strictly construed.  *See*:  *Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100 (1941); *Brown v. Demco, Inc.* 792 F.2d 478 (5th Cir. 1986); *Butler v. Polk*, 592 F.2d 1293 (5th Cir. 1979); C. Wright, A. Miller & E. Copper, 14B *Federal Practice & Procedure: Civil,* §3721.  When subject matter jurisdiction is doubtful, remand is appropriate.  C. Wright, A. Miller & E. Copper, 14C *Federal Practice & Procedure: Civil,* §3739.

IT IS ORDERED that the Plaintiffs' motion to remand is GRANTED.  (Rec. Doc. 7). This matter is REMANDED to the Civil District Court for the Parish of Orleans, State of Louisiana for lack of jurisdiction under 28 U.S.C. §1147(c).  No attorneys' fees and costs will be awarded.

New Orleans, Louisiana, this 27th  day of November, 2007.

_____
HELEN G. BERRIGAN
UNITED STATES DISTRICT JUDGE